UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE:   BIZ AS USUAL, LLC,         :   Chapter 11
                                    :
         Debtor                     :   Bky. No. 19-16476 ELF

# M E M O R A N D U M

## I.  INTRODUCTION

In this case, Biz as Usual, LLC ("the Debtor") seeks confirmation of its Fifth Amended Plan of Reorganization ("the Plan").  The Plan has not been accepted by all impaired classes of creditors.  Therefore, Debtor seeks confirmation under 11 U.S.C. §1129(b).

Two (2) contested matters are presently before the court:

    (1) the objections to confirmation filed by City of Philadelphia ("the City"), Dalin Funding, LP ("Dalin") and the Pennsylvania Department of Revenue ("the Pa. D. Rev."); and

    (2) the U.S. Trustee's ("the UST") motion to dismiss the case ("the UST Motion")

The court held a hearing on both matters on February 18, 2021.

The Plan will be denied confirmation because it is not feasible as required by 11 U.S.C. §1129(a)(11) and it is not "fair and equitable," as required by 11 U.S.C. §1129(b)(1).

In light the Debtor's failure to achieve confirmation despite being provided many opportunities over a lengthy time period, the UST Motion will be granted and the case dismissed.

## II. BACKGROUND

### A.

The Debtor is a limited liability company formed by Antoine Gardiner ("Mr. Gardiner")., President and sole member (Fifth Am. Disclosure Statement at 3) (Doc. No. 157). The Debtor has been in the business of purchasing, rehabilitating, and renting real estate for fifteen (15) years. (Id.).

Over the course of this time, the Debtor acquired nine (9) properties in Philadelphia, Pennsylvania ("the Properties")[1] from owners unable to maintain the physical structures and pay taxes and municipal obligations as they became due. The Debtor acquired the Properties subject to unpaid municipal liabilities, which necessitated entering into payment plans with the City to service the debt. These payment arrangements were not successful, which led to collection action by the City and the Debtor's chapter 11 filing. (Id. at 9).

### B.

The Debtor filed the present voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 15, 2019.[2] The petition was filed on the eve of a sheriff's sale of

---

[1]    2707 N. 33rd St., 3344 Brandywine St., 4830 Woodland Ave., 4832 Woodland Ave., 5477 W. Montgomery Ave., 615 S. 56th St., 4212 Parkside Ave., 5422 Wyndale Ave., and 5736 Wyndale Ave.

[2]    This is not the Debtor's first bankruptcy case. The Debtor previously filed for protection under chapter 11 in 2015 but was unsuccessful in completing a reorganization. See In re Biz as Usual, Bky. No. 15-15040 (dismissed Sept. 14, 2016). Mr. Gardiner also filed two (2) unsuccessful individual chapter 11 bankruptcy cases in 2015 and in 2019. See In re Antoine Gardiner, Bky. No. 15-15582 (dismissed Aug. 17, 2016) and Bky. No. 19-16478 (dismissed Feb. 4, 2021).

There also are three (3) other real estate holding and rental companies that Mr. Gardiner owns as
*[f.n. cont.]*

four (4) the Properties scheduled on October 16, 2019. Since the commencement of the case, the Debtor has been maintaining possession of the Properties and operating its business as a debtor in possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

This has been on a troubled case as result of missed filings, missed deadlines and a failure to prosecute material claims.

On January 24, 2020, approximately three (3) months into the case, the UST filed the UST Motion based on the Debtor's failure to:

- file or obtain approval and/or confirmation of a disclosure statement or plan;
- remain current with the filing of monthly operating reports;
- remain current with its post-petition financial obligations; and
- complete Schedule G and provide notice of its bankruptcy to its tenants.

(Doc. No. 40).

The UST Motion was continued numerous times and carried for over a year (with the UST's consent) to provide the Debtor with opportunities to cure various defects in the case. (See Doc. Nos. 44, 46, 53, 55, 63, 82, 104, 113, 123, 136, 142, 149, 154, 163, 172).

The Debtor filed its first disclosure statement and plan of reorganization in May 2020 (Doc. Nos. 59 & 60) after finally filing several overdue monthly operating reports. (See Doc. Nos. 47-52). The Debtor amended the disclosure statement and plan of reorganization five (5) times. (Doc. Nos. 97, 98, 134, 144, 152, 157, 158).

---

Principal which have filed chapter 11 cases. See In re Major Events Group, LLC, Bky No. 18-10112 (dismissed post-confirmation by consent Jan 11, 2019), In re Wynnefield Multi Media LLC, Bky No. 19-12380 (dismissed Dec. 11, 2019) and In re Bizness as Usual, Inc., Bky No. 19-16477 (dismissed Feb. 4, 2021).

Further setbacks in the case included an illness that disabled the Debtor's then-counsel for approximately a month in the spring of 2020 and the Debtor finally replacing its initial counsel with new counsel in September 2020.

Another particularly troubling aspect of the case involves the Debtor's relationship with Dalin, one (1) of its secured creditors.

On April 7, 2020, Dalin filed three (3) proofs of claim. Dalin asserted that these claims were partially secured and partially unsecured claim, acknowledging that the outstanding debt exceeded the value of the properties securing the claims. (See Claim Nos. 6, 7, 8). In the aggregate, Dalin asserted a secured claim of $805,000.00 and a general unsecured claim of approximately of $438,000.00.[3]

In various hearings before and after the filing of Dalin's proofs of claim, the Debtor's principal addressed the court and asserted emphatically that he possessed signed mortgage satisfactions and that Dalin's claimed secured position was invalid in its entirety. The Debtor has asserted that Dalin filed its claims in bad faith, that the claims are unenforceable and that Dalin engaged in fraud. (Doc. Nos. 60, 98, 144, 152 and 157). The Debtor previously raised similar issues in its 2015 bankruptcy case, but the court dismissed the adversary proceeding

---

[3]   This chart explains how Dalin calculated its claims:

| Claim | Total Amount Due | Secured | Unsecured | Taxes Due | Unsecured Claims (w/taxes) |
|---|---|---|---|---|---|
| 6-1 | $ 764,499.17 | $ 525,000.00 | $ 239,499.17 | $ 40,291.21 | $ 279,790.38 |
| 7-1 | $ 272,902.84 | $ 145,000.00 | $ 127,902.84 | $ 11,212.63 | $ 139,115.47 |
| 8-1 | $ 204,931.86 | $ 135,000.00 | $ 69,931.86 | $ 9,803.24 | $ 79,735.10 |
| Total | **$ 1,242,333.87** | **$ 805,000.00** | **$ 437,333.87** | **$ 61,307.08** | **$ 498,640.95** |

4

without ruling on the merits when the main bankruptcy case was dismissed.  (See  Adv. No. 16-094).

Despite the size of Dalin's disputed claim, its potential impact on the Debtor's reorganization prospects and the existence of a previously filed adversary complaint, it took a court ordered deadline, (See Doc. Nos. 126 and 132), before the Debtor finally pressed its challenge to Dalin's claims by filing an adversary complaint. The Complaint was filed on November 12, 2020, more than a year into this case.  See Biz as Usual, LLC v. Dalin Funding LP, Adv. No. 20-268.  Even then, the complaint was filed late, more than a month after the deadline set by the court.  And then, surprisingly, the Debtor failed to respond to Dalin's motion to dismiss the adversary complaint, which was timely filed on December 14, 2020.  (See Adv. No. 20-268, Doc. No. 10).  Rather than respond to the motion to dismiss, the Debtor eventually filed an amended complaint on February 18, 2021 (the same date as the confirmation hearing).[4]

**C.**

Three (3) creditors, besides Dalin, filed proofs of claim in this case.[5]

---

[4] Earlier in the case, the Debtor showed a similar disregard for routine deadlines.  Dalin filed a motion for relief from the automatic stay on June 17, 2020.  When the Debtor did not respond, the court entered an order granting Dalin relief from the automatic stay.  (See Doc. Nos. 70, 85, 87).  Dalin subsequently agreed to the reimposition of the automatic stay in return for a series of adequate protection payments.  It is possible that this particular failure to attend to the issues in the case was caused by the Debtor's initial counsel's illness.  Even so, the pattern of neglect in this case is unmistakeable.

[5] Key Bank, N.A. filed a proof of claim in the amount of $69,880.85 but withdrew the claim December 7, 2020. (Doc. No. 156).

5

The City filed three (3) proofs of claim. Claim No. 3-1, filed on February 5, 2020 is for taxes, judgments, fees and liens in the amount of $268,952.52 and breaks down as follows:

- $210,937.09 representing the secured portion of the claim;
- $1,453.13 representing a priority tax claim; and
- $56,562.30 representing the unsecured portion of the sclaim

The City filed two (2) other proofs of claim on February 20, 2020. Claim No. 4-1 consists of a secured claim for water/sewer usage in the amount of $42,234.71. Claim No. 5-1 consists of a secured claim for water repair in the amount of $170. Combined, the City has secured claims totaling $253,341.80, a priority claim of $1,453.00 and a general unsecured claim of $56,562.30.

Two (2) creditors account for the remaining claims in the case. The Pa. D. Rev. filed a claim in the amount of $15,181.18, of which $15,174,11 is secured (Claim No 1-1). Hard Money PA, LLC ("Hard Money") filed a (fully) secured claim in the amount of $114,978.51 (Claim No. 2-1).

### D.

On December 8, 2020, the Debtor filed its Fifth Amended Disclosure Statement ("the Disclosure Statement") and Fifth Amended Plan ("the Plan"). (Doc. No. 157). The court approved the Disclosure Statement on December 14, 2020. (Doc. No. 161).

The Plan classified the above creditors' claims as follows:

> Class 1. The City's Allowed Unsecured Priority Claim (Claim No. 3-1)

   Class 2.  The City's Secured Claim for real estate taxes, municipal judgments, and fines.  (Claim No. 3-1)

   Class 3.  The City's Secured Claims for the Water Department (Claim Nos. 4-1 & 5-1).

   Class 4. Secured Claim of the Pa. D. Rev. (Claim No. 1-1).

   Class 5. Secured Claim of Hard Money (Claim No. 2-1).

   Class 6. Claims of Dalin (Claim Nos. 6-1, 7-1, 8-1).

The City's claims are separated into two (2) classes and treated differently:

- Class 1, the unsecured priority claim, is treated as unimpaired, to be paid on the effective date with unspecified interest from operating income.

- Class 2, the secured taxes and Class 3, the water claims are treated as impaired, to be paid from two (2) distinct estate assets: operating income and the sale of real estate.[6]

***There is no separate classification and treatment for the City's general unsecured claim of $56,562.30***.

Dalin's claims (Claim Nos. 6-1, 7-1 8-1) are classified together in Class 6, but treated as if they were otherwise disallowed.  The Plan states that the Debtor owes Dalin nothing on these claims because they were filed in bad faith and are unenforceable pursuant to 11 U.S.C.§ 502(b)(1).  The Plan states the Debtor's intention to file an adversary proceeding addressing all three (3) claims to enable the recovery of money by the estate.  The Plan assumes the Debtor's

---

[6]  The Debtor proposes to make monthly payments of $6,000 from operating income over the course of 36 months for a total payment of $216,000, which includes statutory interest. If an event arises that impairs the Debtor's ability to make the $6,000 monthly payment, it shall not constitute a default under the Plan. Rather, the City must provide the Debtor and Debtor's counsel written notice the payment is 15 days past due and provide the Debtor 30 days to cure or "to demonstrate that the monthly payment has been made and received." The Debtor also proposes to sell or refinance real estate to fund the balance of any secured portion.

success in the adversary proceeding and the resulting disallowance of Dalin's claims. The Plan lacks any provision for Dalin's claims if the Debtor is unsuccessful in the adversary litigation.

Also, significant is the Plan's treatment of Class 10 (equity), the Debtor's interest in the estate:

> The Debtor's principal shall receive such ordinary, customary and necessary payments as he has received prior to the bankruptcy during the pendency of this case, but shall not receive any extraordinary distribution (defined as any payment not in the ordinary course of business in excess of $5,000.00) until all payments set forth in this Plan have occurred.

Three (3) creditors filed timely objections to the Plan on January 25, 2021: the City, Dalin and the Pa. D. Rev. (Doc. Nos. 166, 167, 168).

The Debtor filed its Report of Plan Voting (late) on February 4, 2021. (Doc. No. 171).[7] All classes rejected the plan except for Class 5, which is comprised solely of Hard Money.

The February 4, 2021 confirmation hearing was continued to February 14, 2021. On February 16, 2021, in the interim between the two (2) hearing dates, the Debtor filed two (2) omnibus objections to Claim Nos. 3 and 4 of the City and to all three (3) Dalin claims. (Doc. Nos. 175 & 178). Hearings on the omnibus objections were continued pending the court's ruling on confirmation. (Doc. No. 187).

---

[7] The Report of Plan voting was due on January 20, 2021. The Debtor filed the report on February 4, 2021, the first scheduled date for the confirmation hearing.

8

On February 18, 2021, the court held and concluded the hearings on confirmation and the UST Motion.[8]  (Doc. Nos. 173,181).

### III.  DISCUSSION

#### A.  Confirmation Requirements Under 11 U.S.C. § 1129

Confirmation of a proposed plan of reorganization under chapter 11 of the Bankruptcy Code is governed by 11 U.S.C. §1129 and may be achieved in one (1) of two (2) ways depending upon the outcome of the vote of the different classes of creditors. See In re Armstrong World Industries, Inc. 432 F.3d 507, 511-12 (3d Cir. 2005).

A plan may be confirmed if it is consensual (i.e., accepted by all the impaired classes of creditors, see 11 U.S.C. §1126), and if it meets all the requirements set out in §1129(a).

Alternatively, if a proposed plan does not have unanimous consent of the impaired classes, a court may confirm the plan under §1129(b) if it otherwise meets the requirements of §1129(a), and "does not discriminate unfairly, and is "fair and equitable" as to any dissenting impaired class. 11 U.S.C. §1129(b).  This latter type of confirmation under §1129(b) is referred to as a "cram down."

A debtor may attempt to cram down a plan of reorganization if at least one (1) impaired creditor has accepted the plan.  See 11 U.S.C. § 1129(a)(10).  The policy underlying this requirement is that before "embarking upon the tortuous path of cramdown, and compelling the target of the cramdown to shoulder the risks of error (and related expenses) necessarily

---

[8]    The City joined the Trustee's motion to dismiss early in the case, (Doc No. 45), and pressed for dismissal at the February 18, 2021 hearing.

associated with forced confirmation, there must be some other properly classified group that is also hurt and nonetheless favors the plan." In re Philadelphia Rittenhouse Developer, L.P., 2011 WL 13043475, at *21 (Bankr. E.D. Pa. 2011) (citations omitted).

In either scenario – confirmation under §1129(a) or (b) -- the debtor bears the burden of proving that the plan complies with the Bankruptcy Code. In re Alfaro, 501 B.R. 292, 294 (Bankr. E.D. Pa. 2013).

In this matter, having received the consent of one (1) impaired class (secured creditor, Hard Money), the Debtor seeks to cram down confirmation of the Plan over the objection of four (4) of its impaired classes: Class 2 and Class 3 (the City's secured claims), Class 4 (the Pa. D. Rev.'s secured claim) and Class 6 (Dalin's claims).[9]

For the following reasons, confirmation will be denied.

### B. The Plan Is Not Feasible - 11 U.S.C. § 1129(a)(11)

When attempting to confirm a plan by cramdown pursuant §1129(b), a debtor must first establish that all the applicable confirmation requirements of §1129(a) are met. One of these requirements is that the plan is feasible pursuant. See 11 U.S.C. §1129(a)(11). The debtor must prove feasibility by a preponderance of the evidence. In re S. Canaan Cellular Invs., 427 B.R. 44, 60-61 (Bankr. E.D. Pa. 2010).

A plan is feasible if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the

---

[9] The Report of Plan Voting, which describes Hard Money as the sole creditor in an impaired class that that accepted the Plan is inconsistent with the Plan, which describes Hard Money as unimpaired. However, after reviewing the Plan's proposed treatment of Hard Money, I am satisfied that Hard Money is impaired within the meaning of 11 U.S.C. §1124.

10

debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11); see In re Am. Cap. Equip., LLC, 688 F.3d 145, 155–56 (3d. Cir. 2012).

The purpose of the feasibility test is "to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation." In re Kreider, 2006 WL 3068834 at *5 (Bankr. E.D. Pa. Sept. 27, 2006).

Although §1129(a)(11) does not require a plan's success to be guaranteed, the proposed plan must present "a realistic and workable framework" with a reasonable likelihood of succeeding on its own, without additional reorganization efforts on the part of the debtor. Am. Cap.Equip., 688 F.3d at 156 (citations omitted).

In its consideration of a plan's feasibility, a bankruptcy court must look at the heart of the proposed plan of reorganization – funding. A plan may not be feasible where the funding source is "speculative at best and visionary at worst." In re Quigley Co., Inc., 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010). This is especially true when a plan depends upon litigation for funding.

The Third Circuit has stated that a plan is not feasible if it "hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." In re W.R. Grace & Co., 729 F.3d 332, 348–49 (3d Cir. 2013) (citation omitted). In a similar vein, when a plan's funding is dependent upon the sale of an asset, the debtor has a responsibility to put forth some evidence of a bona fide offer or competent marketing efforts to establish feasibility. See S. Canaan Cellular, 427 B.R. at 63 (citations omitted).

Here, the Debtor has not met its burden of demonstrating the Plan's feasibility. The Plan's success is dependent on highly contested, undeveloped litigation (delayed without justification), and on the sale of assets, a process that not progressed (also, for no apparent

11

reason) during the lengthy period that has passed between the commencement of the case and the confirmation hearing.

Funding for the City's claims hinges on the Debtor's successful reduction or disallowance of a portion of the City's claim through its late filed objection. It also depends upon the complete eradication of Dalin's $1.2 million claim through an adversary proceeding (or the Debtor's late objection). The Debtor has not made any initial demonstration that it is likely to succeed in either endeavor.

While the Debtor has claimed for months that it does not owe the full amount of the City's claims, the prima facie validity of the City's claims remained unchallenged until two (2) days prior to the February 18, 2021 confirmation hearing. Even if I indulged the Debtor and assumed that there is a sufficient prospect of success on its claims objections to warrant confirmation in the face of this uncertainty, the Plan fails to provide for the contingency that the litigation will be unsuccessful.

The Plan does not fully fund the City's claims in the event the Debtor is unsuccessful. As proposed, even if the Debtor can sustain monthly payments of $6,000 over 36 months ($6,000.00 x 36 = $216,000.00)  -- an assumption which is questionable at best and, in any event was not established by the Debtor at the hearing[10]  --  the net payments fall short of the City's secured claims, which total $253,341.80.

---

[10]    The City provided a persuasive mathematical overview explaining why the Debtor's net income necessary for the $6,000.00 monthly plan payment is far from attainable.

After reviewing the available Monthly Operating Reports between November 2019 and October 2020 and including the $17,000.00 Economic Injury Disaster Loan as income (and excluded the returned Paycheck Protection Loan in excess of $69,000.00), the City calculated that the Debtor's net income from rent was barely $800 per month.

The Plans also provides no distribution on account of the City's $56,562.30 unsecured claim.

While the Plan also permits the Debtor to sell three (3) properties within one year of confirmation to make up any shortfall, the Plan provides no remedy to the City if the sales do not materialize.

Moreover, to date, the Debtor has not presented any marketing efforts with respect to any of the properties proposed for sale  The Debtor did file an application for appointment of a listing agent in June 2020 (Doc. No. 79).  But the court never approved that application because the Debtor failed to follow up and request the entry of an approval order.

I also observe that the proposed sale of real estate to fulfill any shortfall on payment the City's claims is complicated by Dalin's mortgage position on three (3) of the properties.  Thus, the Debtors ability to look to these properties for the benefit of the City largely depends upon success in adversary proceeding against Dalin and the elimination of Dalin's liens.  The Plan, as proposed, leaves the City exposed if the Debtor fails (and Dalin is ultimately granted relief from the stay).

In sum, the Plan is filled with too many speculative contingencies to be considered feasible.

---

The City also aptly pointed out that Dalin also has mortgages and assignment of rents against three of the Properties, further reducing the Debtor's ability to make monthly payments to the City. (See City's Objection at 9-10) (Doc. No. 167).

The Debtor offered no evidence to refute the City's calculation.

### C. The Plan Is Not Fair And Equitable - 11 U.S.C. §1129(b).

Even if the Debtor could have met the §1129(a) requirements for Plan confirmation, exclusive of §1129(a)(8), the Plan cannot be crammed down over the City's objections. One of the requirements for a plan to be crammed down is for a debtor to establish that the Plan is "fair and equitable." 11 U.S.C. §1129(b)(1). The Debtor has failed to satisfy its burden with respect to this requirement.

A court's determination of what is fair and equitable depends on the type of claim in the non-accepting class.

For a class of secured claims, fair and equitable treatment requires that the plan satisfy one (1) of three (3) alternatives. A plan may provide that the secured creditor will retain its liens and receive sufficient deferred payments to satisfy its claim in full. A plan may provide for the sale of the collateral with the creditor's liens attached to the proceeds. Or, a plan may provide that the creditor will receive the "indubitable equivalent" of its claim. 11 U.S.C §1129(b)(2)(A).

For unsecured claims, a plan treats dissenting unsecured creditors fairly and equitably if:

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. §1129(b)(2)(B).

In other words, for a plan to be fair and equitable with respect to an unsecured creditor class, the plan must provide either that the creditor's claim is paid in full or that no junior claim

or interest will receive any distribution or retain any estate property on account of the plan. See Bank of Am. Nat.Tr. and Sav. Ass'n v. N. LaSalle St. P'ship, 526 U.S. 434, 441-42 (1999).

These provisions of 11 U.S.C. §1129(b)(2)(B) codify what is known as the "absolute priority rule." Armstrong World Indus., Inc., 432 F.3d at 512; Alfaro, 501 B.R. at 296. The absolute priority rule mandates that a chapter 11 plan may not allocate any estate property whatsoever to any junior class unless all senior classes consent, or unless such senior classes receive property equal in value to the full amount of their allowed claims. It protects dissenting unsecured creditors by preventing debtors from retaining prepetition property if estate creditors are not paid in full.[11]

Courts also have recognized that even if the plan provisions purport to pay secured creditors in full, a plan is not fair and equitable, if it places an undue risk on the creditors in the event of an inability to implement its provisions. See Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 53 (E.D. Pa. 1996); In re Reid Park Props., LLC, 2012 WL 5462919, at *9–10 (Bankr. D. Ariz. Nov. 7, 2012); In re DeLuca, 1996 WL 910908, at *15 (Bankr. E.D. Va. Apr. 12, 1996).

The Plan's most glaring defect is that it violates the absolute priority rule. The Plan provides for no distribution on account of the City's unsecured claim in excess of $56,000.00, yet permits the Debtor's principal to retain his interest in the debtor, including the ability to receive "ordinary customary and necessary" distributions derived from estate property.

---

[11] Many courts have recognized a "new value" exception to the absolute priority rule. See generally In re Haskell-Dawes, Inc., 199 B.R. 867, 871–73 (Bankr. E.D. Pa. 1996). The Plan does not invoke this doctrine.

See In re Monarch Beach Venture, Ltd., 166 B.R. 428, 436 (C.D. Cal. 1993); In re Grogan, 2013 WL 1788024, at *8 (Bankr. D. Or. Apr. 26, 2013); In re Reid Park Properties, LLC, 2012 WL 5462919, at *9 (Bankr. D. Ariz. Nov. 7, 2012).

In addition, the Plan is not fair and equitable as to the City in its secured creditor capacity. The Plan proposes that the City will retain its liens, but the promise of deferred payments is uncertain and inadequate, and, significantly, there are no provisions providing remedies or protection to the City in the event of a default. In effect, the Debtor will suffer no tangible consequence if it defaults. The Plan puts all of the risk on the City with no adverse consequences to the Debtor in the event of a default. This is not fair and equitable.

### D. The UST Motion Will Be Granted and the Case Dismissed

The UST Motion is based on 11 U.S.C. §1112(b).

Section 1112(b)(1) of the Bankruptcy Code provides that the court "shall" convert or dismiss a chapter 11 case, whichever is in the best interests of creditors, if a movant establishes "cause." See 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) identifies sixteen (16) examples of "cause" for purposes of § 1112(b)(1). These examples of cause in §1112(b)(4) are merely illustrative and not exhaustive. In re Ramreddy, Inc., 440 B.R. 103, 112 (Bankr. E.D. Pa. 2009); see also In re Domiano, 442 B.R. 97, 105 (Bankr. M.D. Pa. 2010)

One recognized ground for finding cause for dismissal is the debtor's inability to effectuate a plan of reorganization. See In re DCNC N. Carolina I, LLC, 407 B.R. 651, 664–65 (Bankr. E.D. Pa. 2009), aff'd sub nom. DCNC N. Carolina I v. Wachovia Bank, N.A., 2009 WL 3856498 (E.D. Pa. Nov. 13, 2009).

Here, I find cause exists for dismissal of this case. The Debtor has been unable to propose a confirmable plan of reorganization after numerous efforts over an inordinate amount time.

From commencement of the case to the confirmation hearing, more than fifteen (15) months passed. The Debtor failed to appreciate the need to utilize the reorganization tools available (in this case, challenges to the claims of the City and Dalin and the power to sell assets) and squandered the time and opportunity that this court has provided (over the objection of the City) for the attempted reorganization. The Debtor failed to initiate the necessary litigation against Dalin and the City in a timely fashion and failed to market the properties it proposes to sell in a diligent fashion. The Debtor's effort, at the eleventh hour, to pursue the litigation was too little, too late, not to mention that the Debtor still has not demonstrated a commitment to the sales of real estate that are critical to the success of its proposed Plan.

To confirm and implement another plan, the Debtor would have to propose a new plan and then go through the disclosure and plan voting process again. The Debtor has already filed six (6) proposed plans. Most of the interested parties have been patient, as has the court, in providing the Debtor with ample opportunity to reorganize. At this point, I have no confidence that, given more time, the Debtor can make the revisions to the plan and necessary to achieve confirmation within a reasonable time. The reorganization process is finite and the time has come to end this case.

## IV. CONCLUSION

For the reasons set forth in this Memorandum, confirmation of the Debtor's Fifth Amended Plan will be denied. In addition, the Trustee's Motion to Dismiss this case will be granted.

An appropriate Order follows.

**Date: April 28, 2021**

　　　　　　　　　　　　　　　　　　　**ERIC L. FRANK**
　　　　　　　　　　　　　　　　　　　**U.S. BANKRUPTCY JUDGE**